### BARBER v. OTIS MOTOR SALES CO.

(District Court, N. D. New York. March 31, 1916.)

1. **PATENTS ⊛⇒328—VALIDITY AND INFRINGEMENT—VALVE AND VALVE GEAR FOR MOTOR ENGINES.**

The Barber patent, No. 781,802, for a valve and valve gear for explosive engines, of such construction that the valves of a motor engine may be readily and quickly removed and replaced when necessary for cleaning, repairing, etc., is for a new and useful combination of old elements, was not anticipated, and discloses patentable invention of a high order. Claims 8 and 9 also *held* infringed.

2. **PATENTS ⊛⇒235—INFRINGEMENT—INFERIOR OR SUPERIOR OPERATION.**

That another structure is superior to that of a patent, or that it performs some other function, does not avoid infringement, when the same elements perform the same functions in substantially the same way.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 371; Dec. Dig. ⊛⇒235.]

In Equity. Suit by William Barber against the Otis Motor Sales Company. On final hearing. Decree for complainant.

This is an action in equity to restrain alleged infringement of United States letters patent No. 781,802, dated February 7, 1905, for "valve

and valve gear for explosive engines," and which patent was applied for February 24, 1902. The complainant also asks an accounting.

Fred F. Weiss, of New York City (Samuel E. Darby, of New York City, of counsel), for complainant.

Coudert Bros., of New York City (R. A. Parker, of Detroit, Mich., of counsel), for defendant.

RAY, District Judge. Claims 8 and 9 of the patent issued to William Barber, of Brooklyn, N. Y., assignor to Ada S. Barber, No. 781,802, dated February 7, 1905, applied for February 24, 1902, are in issue. These claims read as follows:

"8. In an explosive motor, the combination with an explosion chamber having a T-shaped gas passage the main central or stem portion of which forms the explosive vapor inlet, of a valve seat ring provided with gas passages located in the end of the head portion of the T-passage adjacent to the explosion chamber, a puppet valve carried by the valve seat ring opening toward the explosion chamber, a spring normally keeping the valve in the closed position, and a screw plug provided with a perforate peripheral wall and a closed outer and an open inner end closing the outer, or air end of the head portion of the T-shape passage and holding the valve seat ring in position thereof, through the perforations in the wall of which the explosive vapor passes from the main or stem portion of the T to the valve at the open end of such plug, substantially as shown and described.

"(9) In an explosion motor, the combination with an explosion chamber having a T-shaped gas passage the main central or stem portion of which forms the exhaust orifice of the explosion chamber of a screw plug closed at the outer end, open at the inner end, and having a perforated peripheral wall, so as to give free communication between the central hollow thereof and the main stem or central passage and the explosion chamber located in the head portion of the T-shaped passage, a puppet valve, the stem of which projects outward through the head of the plug seated upon the inner end of the plug, so as to cut off communication between the main stem portion of the T-passage and the explosion chamber, except when the same is forced away from the seat and toward the explosion chamber, a spring for normally keeping the valve in the closed position and means for forcing the valve stem inward, so as to open the valve actuated by the motor and adapted to be removed from contact with the valve stem without removal from the support thereof, so as to permit of removal of the plug and valve by the unscrewing of the plug, substantially as shown and described."

Title to this patent is conceded to be in the complainant. The Otis Motor Sales Company is a dealer in the alleged infringing device, but the Reo Motor Car Company is the manufacturer and also a seller of such device, and that company is in fact defending this action.

[1] The complainant has proved the utility and operativeness of his device. In view of the prior art, does it disclose patentable invention? This court thinks it does. A large number of prior patents have been introduced in evidence, but I am unable to find anything which anticipates, or which demonstrates that an ordinary mechanic skilled in the art would have produced what Barber did.

Claim 8 calls for the combination in an explosion motor of the following elements, viz.: (1) An explosion chamber which has a T-shaped gas passage, the main central or stem portion of which forms the explosive vapor inlet. (2) A valve seat ring provided with gas passages located in the end of the head portion of the T-passage adjacent to the explosion chamber. (3) A puppet valve carried by the valve seat ring

opening toward the explosion chamber. (4) A spring normally keeping the valve in the closed position. (5) A screw plug provided with a perforate peripheral wall and a closed outer and an open inner end closing the outer or air end of the head portion of the T-shaped passage and holding the valve seat ring in position thereof through the perforations in the wall of which the explosive vapor passes from the main or stem portion of the T-shaped passage to the valve at the open end of such screw plug.

Claim 9 calls for the combination in an explosion motor of the following elements, viz.: (1) An explosion chamber having a T-shaped gas passage the main central or stem portion of which forms the exhaust orifice of the explosion chamber. (2) A screw plug closed at the outer end, open at the inner end, and having a perforated peripheral wall, so as to give free communication between the central hollow thereof and the main stem or central passage and the explosion chamber located in the head portion of the T-shaped passage. (3) A puppet valve, the stem of which projects outward through the head of the plug, seated upon the inner end of the plug, so as to cut off communication between the main stem portion of the T-passage and the explosion chamber, except when the same is forced away from the seat and toward the explosion chamber. (4) A spring for normally keeping the valve in the closed position. (5) Means for forcing the valve stem inward, so as to open the valve actuated by the motor, and adapted to be removed from contact with the valve stem without removal from the support thereof, so as to permit of removal of the plug and valve by the unscrewing of the plug.

It will be seen that these claims describe the object and purpose or function of certain of the elements. In the specifications of the patent the patentee said:

"The object of my invention is to provide a motor-engine of the explosion vapor type of a simple and cheap form of construction, so made that the inlet and exhaust valves thereof may be quickly and easily removed from the body of the motor without disturbance of the other parts, and quickly cleaned, adjusted, or renewed as occasion may require, and returned to position, and also to provide motors of such type with a combined electric circuit making and breaking and speed-regulating device of improved form."

In this litigation we have nothing to do with the electric circuit making and breaking and speed-regulating device of improved form. The patentee then says:

"To such ends my invention consists, in substance, of a cylinder, a piston, reciprocating in the cylinder, a crank shaft in actuative connection with the cylinder by means of a connecting rod, an explosion chamber adjacent to the cylinder in communication with inlet and exhaust passages, an exhaust valve plug located in the exhaust passage, a normally spring-closed exhaust valve carried by the exhaust valve plug, a gear wheel carried by the crank shaft, a combined gearing and a cam wheel rigidly mounted upon an idler shaft meshing with a wheel carried by the crank shaft, and a rod reciprocating in a slip journal actuated by the cam, so as to open the exhaust valve, such rod being adapted by rotation upon its axis to be thrown out of engagement with the rod of the exhaust valve, * * * an inlet valve bushing adapted to be secured in the casing of the explosion chamber, so as to be in communication therewith, with the atmosphere, and with the explosive vapor supply source, and an inlet valve plug carrying a normally closed inlet valve adapted to inclose the inlet bushing, although it is not to be understood that my in-

vention is limited to a device comprising at once all of the devices and parts before mentioned, as the same consists of the construction of certain devices and parts, and the construction, combination, and arrangement of certain devices and parts, all as hereinafter more particularly set forth in the description and pointed out in the claims."

In the specifications we also find the following:

"Above the cylinder A proper is the explosion chamber G, usually of the elongated form, shown extending at right angles to the axis of the cylinder A and having on the side of the extension forming the outer end of such cylinder the exhaust orifice H and on the opposite side the inlet orifice I, and formed in the explosion chamber wall at the end of the extension thereof between the inlet and outlet orifices is the ignition plug orifice K."

It is thus plain that the explosion chamber is elongated or extended from side to side of Fig. 1, and that upon the upper side of the left-hand end of the explosion chamber, as shown in Fig. 1, is what is called the "inlet orifice I," and on the lower side and opposite I is what is called the "outlet orifice H." By inlet orifice and outlet orifice I think the patent means the whole of the space above the inlet valve and below the outlet valve respectively. Of course, the inlet orifice proper and the outlet orifice proper connect directly with these two spaces respectively. The patentee goes on to say in substance that:

"In such devices as heretofore used the larger proportion of accidents thereto and stoppages thereof when in operation are caused by clogging of either the exhaust or inlet valves, and in order to clear the same it has heretofore been necessary to remove numerous parts and uncouple the same one from another in order to put the motor in condition for operation again. This difficulty I obviate by so constructing and securing the inlet valve to the casing of the explosion chamber that by the unscrewing of a single screw part such valve, together with its seat, may be removed bodily from the casing, cleaned, adjusted, or renewed, and again returned to position by reversal of this process, and by also providing an exhaust valve plug carrying the exhaust valve screwed into the casing, so as to close the outlet or exhaust orifice thereof, which exhaust valve plug and valve may be removed bodily from the casing by simply unscrewing the same after a set screw has been removed from the cam rod actuating the same, and such rod given a quarter-revolution, the valve then being movable from its seat by the removal of a key."

The evidence shows and it is well known that the valves of motor engines frequently get out of order and require cleaning and repairs of various kinds. A construction which is safe and of reasonable cost, which will enable the owner to remove and replace these valves speedily and cheaply and without injury to the motor engine, is therefore of great value. Here was the problem which confronted Mr. Barber, the inventor in this case, and the evidence shows that he solved the problem satisfactorily, and that his invention went into use, and that this defendant and others have appropriated it, to his damage and injury. Mr. Barber has not been guilty of any laches in endeavoring to enforce his rights. He is not a man of wealth but this is no reason why courts should not give him the same consideration they would give wealthy men or wealthy corporations. I find and hold that the structure of the patentee discloses patentable invention in view of the prior art and that there is no anticipation.

The defendant placed in evidence more than 20 different patents, but no one of them shows the combination of Mr. Barber, and no one

of them shows a combination of elements which solves the problem presented to Mr. Barber, and which he successfully solved. There is no one element in the combination of Mr. Barber which is absolutely or entirely new; but he has a new combination and a useful combination of old elements, and the making of this combination discloses patentable invention of a high order. His invention has been availed of by others, and several have taken a license under his patent, while others are boldly infringing. The defendant in this case struggled vainly to show a combination in any prior patent which solves the problem presented to this complainant. The defendant presented patents which disclosed one or more of the elements found in the Barber patent, but it has been held again and again that a new and useful combination of old elements which results in a new structure of utility, and which the ordinary mechanic skilled in the art would not have produced, constitutes patentable invention.

## Claim 8.

In the structure of claim 8, we have an explosive motor with a cylinder and a piston in the cylinder. When in operation this piston is drawn from the cylinder away from the combustion chamber by the action of a crank shaft. As it is drawn out a charge of explosive vapor is taken in through a pipe and through the perforations in the walls of a screw plug to a valve, the inlet valve, which valve is normally closed, and kept closed by a spring on the stem thereof, and which valve is opened by air pressure from the outside to permit this explosive charge of vapor to pass into the explosion chamber. One part of the screw plug receives the valve, which is sustained in position by a ring or seating in the cylindrical plug and adjacent to an extension of the explosion chamber. This gas passage is T-shaped. With the model before us, or the drawing, the T is on its side thus, |—, with the head portions extending upwardly and downwardly respectively, and this T-shaped gas passage is closed at its upper end by the head of a screw plug, and at its lower end by the valve itself when in a normally closed position. This valve is adjacent to the extension of the explosion chamber. This main stem portion of the T-shaped passage leads to the outer air, or, more properly, leads to and is connected to a conduit for the introduction of the explosive vapor. Next we have the valve seat ring provided with gas passages and this valve seat ring is located in the end of the head portion of the T-shaped passage and next to the explosion chamber; that is, at the lower end of the head of the T when on its side. Next we have the puppet valve, which is carried or supported by this valve seat ring, and this valve by reason of pressure from the outside opens toward the extension of the explosion chamber; that is, when pushed or pressed upon, the valve moves towards the explosion chamber. The spring on the stem of this valve keeps it normally in a closed position. Then we have the screw plug, which has a perforated peripheral wall and the outer (or upper) end is closed, and this closure terminates the upper end of this T-shaped gas passage. The inner or lower end nearest the valve itself is open. This screw plug closes the outer or air end of the head portion

of the T-shaped passage, and also holds the valve seat ring (by a shoulder thereon) "in position thereof," and through the perforations in the walls of this screw plug the explosive vapor passes from this main or stem portion of the T-shaped passage directly to the valve, or at a right angle to its course when entering.

On the trial there was considerable contention as to what was meant by and what constitutes this T-shaped gas passage. Taking either the model in evidence or the drawings of the patent there is no room for question or conjecture, unless we would pervert the meaning of words, change the location of things described, and put the claims and specifications and drawings in conflict to destroy the patent. It was contended by the defendant on the trial that the T-shaped gas passage consisted of the main explosion chamber and the extension thereof and the passages upward to the gas explosive inlet and the passage downward to the exploded gas outlet, the one containing the inlet and the other containing the outlet valves, respectively. This contention cannot be sustained, and as I read and understand the brief of the learned counsel for the defendant this claim is substantially abandoned, or at least is not urged and insisted on.

It will have been observed that claim 8 deals mainly with the inlet and inlet valve construction.

## Claim 9.

In this structure of claim 9 (the cylinder and explosion chamber is common to both claims) we have a T-shaped gas passage also, but not the one mentioned in claim 8, and here the main central or stem portion forms the exhaust orifice having connection with the explosion chamber. Here we have a screw plug closed at its outer end; that is, closed at its lower end as it screws in from below. This screw plug is open at its inner end (upper end) adjacent to the extension of the explosion chamber, and has a perforated peripheral wall, and as a result we have free unobstructed passage from its open central portion and also from the main stem or outlet passage to the explosion chamber, or, what is the same thing, between the explosion chamber and the outlet passage by way of the central portion of the screw plug. This claim speaks of the explosion chamber as located *in* the head portion of the T-shaped passage. This means that the explosion chamber extension is at the head portion of the T-shaped passage, if the claim is now describing the location of the explosion chamber; but I am of opinion this description should and does apply to the location of the "central hollow thereof"—that is, the central hollow of this screw plug— inasmuch as there the exhaust opening *(30')* is located. Then we have the puppet valve of the exhaust mechanism, which shuts off communication between the "main stem portion" or outlet of the T-shaped passage and the explosion chamber, except when the valve ("the stem") is forced away from its seat and towards the extension of the explosion chamber. This valve has a spring on its stem to keep it normally closed. Then we have means for forcing this valve stem inwards (pushing it upwards, as we look at the model or the drawing) and this is done by the motor, and opens the valve for the escape of the exploded gases. These "means" for forcing the valve stem

inward, so as to open the valve, which is actuated by the motor, are adapted to be removed from contact with the valve stem without removal from the support thereof by simply making a quarter turn of the push rod which is the support thereof. When this is done, the plug may be unscrewed and removed, taking the valve with it.

Here we have a construction which is efficient and durable, and which enables the owner of the motor or its user, when the valves are out of order from any cause, to remove both valves by unscrewing a valve plug and lifting out the inlet valve in the one case, and by giving a quarter turn to the push rod and unscrewing and removing the valve plug and outlet valve in the other case, first removing a small set screw which holds the push rod in position. It is vain to search the prior art for a construction and combination like this. Each and every patent in evidence, which shows a valve cage, or a screw plug, or a combination of both, has one or more obstructions to a removal of these parts, which interfere with the removal of the valves. Various of these patents show that efforts had been made in the direction of securing a quick removal of the valves, but no one had fully solved the problem until Barber came into the field. In a sense and to an extent, at least, he is a pioneer. In but one or two of the prior patents is any reference made to the problem which Barber sought to solve.

On the trial and in defendant's brief much was and is said about push rods with tappets of both the fixed and movable types of tappets. This, in my judgment, has little to do with this litigation. Push rods with a bent-over end forming a tappet are of course old; but this is one of the elements merely in complainant's combination. His claims are for a combination, and the patentable invention disclosed resides in the combination as a whole, and not in a single element thereof. Valve cages are old; but Barber's invention does not reside in a valve cage merely. That is but one of the elements of his combination. A French patent was put in evidence, which had a flexible push rod; but there is no evidence that such a structure was ever used, or that it could be practicable. Clearly to my mind such a structure with a flexible push rod would be inoperative.

## Infringement.

That the defendant infringes the complainant's patent cannot be successfully denied. The defendant has an explosion motor with the explosion chamber—the chamber into which the explosive vapor mixture is introduced and in which the explosion takes place. The defendant has a valve seat ring—a ring-shaped portion in which is formed the seat against which the inlet valve is held normally closed by means of a spring, and this valve is of the puppet type and opens towards the explosion chamber. The valve seat ring of defendant is provided with gas passages to permit the gases of the explosive mixture to pass through the openings controlled by the valve and into the explosion chamber. The defendant has a screw plug, the peripheral wall of which is perforated, and the inner end of which plug is open, and the outer end is closed, and the function of this screw plug is to hold the valve seat ring in position. The function of the perforations

in the peripheral wall of the plug is to allow the passage of the explosive mixture into the interior of the plug, and to the inner end thereof, and through the valve seat ring, and thence on into the explosion chamber. In the Barber patent, shown in the drawings, the screw plug is made separately from the valve seat ring. In defendant's structure, the screw plug and the valve seat ring are integral. This is immaterial. The two, put together, are the same as defendant's, and defendant's is the same as the two pieces of complainant, when put together so as to be operative. The function of each is the same, and they operate in precisely the same way to produce the same result. The valve seat ring in both structures forms a seat against which the valve is seated. The screw plug of the Barber patent, with its perforated peripheral wall, closes the outer or air end of the passage in which it is located, and which the patent calls "inlet orifice $I$," and this is an opening through the cylinder casting to receive the valve structure.

[2] Secondly, this screw plug holds the valve seat ring in its position against a shoulder formed in the orifice referred to. In defendant's device the screw-threaded portion is integrally connected to the valve seat ring, and performs the function of holding the valve seat ring in position, and is seated against the seat formed to receive it in the opening through the cylinder casting. We have the same structures, with the same functions, substantially. The perforations in the wall of the screw plugs in both cases are to permit the passage of the explosive mixture to the interior of the plugs, and thence to the inner open end and through the valve, and thence to the explosion chamber. If it be true that defendant's structure is inferior to complainant's, this does not avoid infringement, so long as there is legal identity of structure, operation, and result. Patentable invention in Barber does not reside in the T-shaped passage necessarily. But Barber has a T-shaped passage, and whether it be a perfect T or not is immaterial. It is clear that defendant has a T-shaped passage. This passage may include others in a way and to an extent; but this addition, if it be such, does not avoid infringement, as the defendant still has the equivalent of complainant's T-shaped passage. In fact, the misnomer of a thing plainly shown and described in a patent will not defeat the patent, unless it be misleading and so confusing that a person skilled in the art would not know what was meant, and could not or naturally would not understand and be able to avoid infringement.

It is suggested by defendant, rather than argued, that claim 9 of the patent in suit is not infringed, for the reason it refers to the exhaust valve and plainly describes the exhaust valve of the Barber patent; whereas in the defendant's structure the mechanically operated valve adapted to be removed without removal from its support or the means which actuate said value is the inlet valve. In motor engines sometimes the inlet valve, and sometimes the exhaust valve, and sometimes both, are mechanically operated. The difference is immaterial here, for the fact is that the defendant uses the structure of the Barber patent, and mere changes of form or location, without change of mode and principle of operation and result, will not avoid infringement. In the Barber patent the exhaust valve is mechanically

operated by mechanism which it is not necessary to remove from its support, to the end that the valve cage and valve may be removed and replaced. In the defendant's structure the same or equivalent mechanism is employed in connection with the inlet valve, and this mechanism includes a rock arm engaging the valve stem and a push rod for rocking the arm. The valve cage and valve are removable from the seat in the cylinder casting without removing from its support the rock arm which engages the valve stem to operate the valve. I do not see that infringement can be avoided by applying the invention of Barber, so far as removal from the seat, etc., is concerned, to the inlet valve, and making the outlet valve after the principle adopted by Barber as to the inlet valve. The point of the invention in this respect is to make these valves removable without dismantling the machine. Ordinarily it is as essential to remove the one as it is to remove the other. It is true that claim 9 refers to an exhaust valve, but the defendant has appropriated that identical combination and has secured all its advantages and benefits in its inlet valve structure.

On the trial defendant's expert pointed out certain claimed advantages secured by the defendant's construction. This is immaterial, so long as the defendant uses the complainant's combination or equivalents therefor. Added advantages in some cases may show patentable improvement over the infringed structure or combination; but these advantages, when they exist, even if patentable, do not justify the use of the prior patented combination. When a device has the same elements performing the same functions in substantially the same way as a prior patented device, it is immaterial that the alleged infringing device performs some other function. I think it clear, as before stated, that the defendant has used and is using a structure which has all the elements of the Barber combination combined in the same way, for the same purpose, and producing the same result.

I have found it unnecessary to go through the prior patents in detail. I have examined them all carefully and am satisfied:

1. That the Barber patent is valid, and was not anticipated; that it discloses patentable invention, in view of and in the face of the prior art.

2. This is true of all the claims in issue.

3. The defendant infringes the claims in issue.

There will be a decree for the complainant, with costs.